Overseas Credit Corporation, Plaintiff, *v.* Cal-Tech Systems, Inc., et al., Defendants, and Morris A. Hirsch et al., Impleaded Defendants. (Action No. 1.)

Trade Development Bank, Respondent, *v.* Cal-Tech Systems, Inc., et al., Defendants and Third-Party Plaintiffs, Appellants. Robert A. Martin et al., Third-Party Defendants. (Action No. 2.)

First Department, February 27, 1964.

David A. Botwinik of counsel (Murray Mogel and Howard E. Chase with him on the brief; Fink & Pavia, attorneys), for respondent.

Milton Pinkus of counsel (Richard J. Stull and Robert A. Stull with him on the briefs; Milton Pinkus and Stull & Stull, attorneys), for Cal-Tech Systems, Inc., appellant.

Louis Okin of counsel (Sam W. Galowitz with him on the brief; Fisher, Okin, Gleiberman & Ezrine, attorneys), for Ezrine appellant.

BREITEL, J. Plaintiff, holder of two promissory negotiable notes for $25,000 each, was granted summary judgment against the corporate maker and an individual indorser under rule 113 of the Rules of Civil Practice (now CPLR 3212). Maker appeals urging that there are issues of fact whether plaintiff was a bona fide holder in due course and, particularly, whether the signatory on behalf of the corporate maker, who is the defendant indorser, was authorized by the corporation to execute the notes. Defendant indorser, Ezrine, appeals urging that there are issues of fact whether plaintiff holder was a bona fide holder in due course, but insisting that he, as signatory, was authorized to act on behalf of the corporate maker.

Plaintiff holder is a Swiss corporation which engages in financing transactions and has done business over a period of time with Tracon Corporation, the negotiator of the notes in suit. Tracon does a financing business in this city. It took the notes, as indorsee, for value, from one Robert A. Martin, the payee. It, in turn, indorsed and discounted the notes with plaintiff holder. Martin is a stockbroker who arranged with Ezrine, then secretary, chairman of the board of directors and one of the largest stockholders of the corporate maker, to obtain financing on the corporate notes for the purpose of buying the corporation's own shares on the over-the-counter market. Ezrine says that Martin diverted the notes, applied the proceeds to reducing Martin's own indebtedness for the unauthorized purchases of the corporation's shares on the market. Indeed, when Tracon, to whom Martin had transferred

the entire series of six notes, of which the two in suit are a part, was sued on the first two notes (in the consolidated action first captioned above), two of the defendants in that suit, namely, the corporate maker and Ezrine, defended on the ground that the notes had been diverted, the proceeds converted, and that Tracon had acted in conspiratorial knowledge with the broker Martin.*

It was while that action was pending and while the corporate maker was preparing to apply for an injunction to restrain further negotiation of the notes that Tracon negotiated the two notes in suit to plaintiff holder. This was done by cable and confirmatory letter. Plaintiff, since it did not know the maker or Ezrine, insisted on the indorsement of Tracon and its individual principal, Hirsch. It exacted a 9% discount. This was a flat 9% discount, not an annual rate, and the notes were to mature in two and three months respectively. Shortly after the negotiation of the notes, Tracon asked for and received transfer of its credits on plaintiff's books to banks in New York City, for the account of Tracon.**

When the notes were presented the corporate maker and the indorser Ezrine refused to pay on the ground that plaintiff was not a holder in due course. The holder sued only them, in the second action captioned above, and not the other indorsers, Tracon and Hirsch, who had discounted the notes with plaintiff.

At this point the procedural status of the appeals is relevant. Immediately after joinder of issue, on February 11, 1963, plaintiff moved for summary judgment. Thus, at this time defendants had had no opportunity to obtain any pretrial discovery, essential if they were to establish that the Swiss corporation, a stranger to them, was not a holder in due course. However, the motion was not actually decided until April 3, 1963. Up until that time defendants made no attempt to obtain any pretrial discovery and Special Term commented on this omission. It also held that no creditable proof had been submitted to raise any issue of fact, namely, addressed to what plaintiff holder knew or should have known. Until then, and

---

* Actually, the wrongdoing attributed to Martin was that he bought the stock before first procuring the loan as directed; that thereafter, when the market dropped, he used the notes to pay off the obligations for the stock; and that he permitted Tracon to hold the notes and the purchased stock as collateral for the advances. What this had to do with the internecine corporate struggle discussed later, if anything, is not disclosed by the record.

** As to this being the giving of value, see Britton, Bills and Notes (2d ed.), § 97, and cases cited. Defendants do not question in the record plaintiff's status as holder for value.

358

even through the entry of the order for summary judgment on May 8, 1963 and the denial of a subsequent motion for reargument, the corporate maker and Ezrine were represented by the same law firm of which Ezrine is a member.

In late June, 1963 the corporate maker broke away from Ezrine, and retained new and independent counsel, who made a motion for a rehearing. This motion was denied by Special Term on the ground that it did not rest on newly discovered evidence, and that the corporate maker knew as early as November, 1962 that the notes had been issued. It is on this motion, for the first time, that the corporation asserted as a defense that Ezrine was not authorized to make the notes on behalf of the corporation, in addition to the other defenses attacking plaintiff's status as a holder in due course.

Because of the procedure it is necessary to consider the record in the two separate stages in which it was developed.

On the first motion, the corporate maker and the indorser joined in their defenses which depended exclusively upon showing that plaintiff was not a holder in due course. To do this they established the alleged conspiracy between Tracon and Martin, pointed to the peculiarity of the negotiation of the two notes after the defenses had been exposed in the lawsuit on two prior notes, the negotiation to a Swiss corporation, the high rate of discount, the prior relationship between Tracon and the Swiss corporation, and the early maturity of the notes negotiated at such cost over such a great distance. They also stressed that plaintiff had insisted on the indorsements of Tracon and Hirsch.

Plaintiff in making the motion had disclosed the cables and confirmatory letter correspondence arranging for the negotiation of the notes and, also, the transfer of credits to show the parting with value for the notes. It disclaimed all knowledge of the transactions among Ezrine, Martin and Tracon.

On this basis defendant established no more than suspicious circumstances as distinguished from facts that brought home to plaintiff either knowledge or a duty to make further inquiry. Suspicious circumstances alone do not constitute notice of an infirmity or defect in the instrument sufficient to constitute bad faith and destroy the status of holder in due course (Negotiable Instruments Law, § 95*). In *Hall* v. *Bank of Blasdell* (306 N. Y. 336, 340–341) Judge FULD for the Court of Appeals stated the rule as follows: " the existence of merely suspi-

* Cf. Uniform Commercial Code, § 3-404, eff. Sept. 27, 1964.

cious circumstances does not, without more, amount to notice of an infirmity or defect. To constitute such notice, the person to whom the instrument is negotiated 'must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith' (Negotiable Instruments Law, § 95). As the statute itself makes evident, its requirement 'is good faith, and bad faith is not mere carelessness. It is nothing less than guilty knowledge or willful ignorance. * * * One who purchases commercial paper for full value * * * is not bound at his peril to be upon the alert for circumstances which might possibly excite the suspicions of wary vigilance. He does not owe to the party who puts negotiable paper afloat the duty of active inquiry, to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by speculations in regard to the purchaser's diligence or negligence'. (*Manufacturers & Traders Trust Co.* v. *Sapowitch,* 296 N. Y. 226, 229–230; see, also, *Cheever* v. *Pittsburgh, Chenango & Lake Erie R.R. Co.,* 150 N. Y. 59; *Chapman* v. *Rose,* 56 N. Y. 137, 140; *Goodman* v. *Simonds,* 20 How. [U. S.] 343; *Goodman* v. *Harvey,* 4 Ad. & El. 870.) ''

The discount, though large, was not so great under the circumstances to support an inference that plaintiff holder knew the notes had been dishonestly or improperly acquired.

It has often been held with regard to sizable discounts that judgment should nevertheless be entered or a verdict directed for plaintiff holder (e.g., *Second Nat. Bank* v. *Weston,* 172 N. Y. 250 [discount to rate of 8% per annum]; *Credit Alliance Corp.* v. *Buffalo Linen S. Co.,* 238 App. Div. 18 [approximately 17% flat discount on installment debt payable over two years plus interest, if any]; *Coopersmith* v. *Maunz,* 237 App. Div. 795 [10% flat discount on paper payable in two months]).

Even when the discount is much greater and combined with other unusual circumstances, it has been held that the question is one for the jury, and no verdict may be directed for the defendant maker (e.g., *Canajoharie Nat. Bank* v. *Diefendorf,* 123 N. Y. 191 [discount which insured 15% to 18% profit — unusual circumstances, including knowledge that maker of substantial note was only an ordinary farmer and seller of note was a total stranger]; *Vosburgh* v. *Diefendorf,* 119 N. Y. 357 [note purchased for half its face value from known parties to original transaction]; *Becker* v. *Hart,* 135 App. Div. 785 [flat discount of over 45% on unquestionably good note having

less than six weeks to run, under unusual circumstances, including release of parties responsible for debt by lack of protest, and concealment of the purchase of the note until after the death of the only person who could successfully challenge its validity]; cf. *Manufacturers & Traders Trust Co.* v. *Sapowitch,* 296 N. Y. 226, 229–230; *American Exchange Nat. Bank* v. *New York Belting & Packing Co.,* 148 N. Y. 698, 705–706).

The rule on discounts is well stated as follows by an authoritative commentator: "Anyone who has given but casual attention to the effects of an economic depression upon the prices of public and private securities and upon the notes of private individuals knows that the purchase of an instrument at a discount, be the discount small or large, is no evidence of purchase in bad faith. The great bulk of commercial paper in circulation at any given time represents enforceable obligations. It is only in the exceptional case that a defense or equity does arise. The study of the law of bills and notes throws out of focus one's perspective of the percentage of honest payees as against those who are dishonest or of obligors who default in their promises. Commercial paper has a value in the market the same as land and chattels. The value of such paper is determined by the present and prospective means of payment of the obligor thereon. Actual and potential insolvency of the issuer has much more to do with the price of commercial paper than does the possibility that it was obtained by the first holder subject to a defense or that it had been obtained by a subsequent holder subject to an equity of ownership in a former holder. Therefore, the purchase of an instrument at a discount, of whatever amount, is not, of itself, evidence of purchase in bad faith." (Britton, Bills and Notes [2d ed.], § 109, p. 273.)

In this case the holder dealt with a known customer but concerning an obligation of an unknown maker. The transaction did not arise out of prime paper issued in a sales transaction between industrial corporations of general reputation. Tracon like the holder is a secondary financier who is not a bank which, when occasion requires, can rediscount paper with a correspondent or central bank.

Consequently, Special Term properly granted summary judgment and properly denied the subsequent motion for reargument.

The motion for a rehearing made by the corporate maker introduced an entirely new factor. Insofar as it raised the issue of the authority of Ezrine to make the notes on behalf of the corporate maker it raised an issue of fact. This is

because the holder always has the burden of showing the authority of the signatory of negotiable paper or conduct by the principal which precludes assertion of the lack of authority, before it may invoke the other presumptions in its favor (Negotiable Instruments Law, §§ 38, 42; *Standard S.S. Co. v. Corn Exchange Bank,* 220 N. Y. 478, 481. Cf. Uniform Commercial Code, §§ 3–403, subd. [1]; 3–404. On apparent authority see Restatement, Agency 2d, § 27; 2 N. Y. Jur., Agency, §§ 25, 88, 89).

Nor does it wholly offset the raising of the issue that Ezrine promptly made affidavit against his codefendant asserting that he had authority to make the notes, although still contending that he and his corporation had been cheated and that plaintiff was not a holder in due course. But such contradiction between defendants assuredly does not lend strength to the belated assertion of a new defense after the others had failed. This improbable imbroglio issued from the fact of intracorporate struggle and factionalism with a shift of control. While raising an issue, it is also obvious that factional dispute and the shift of control account too well for the opposite positions taken by the now-ins and former-ins who are now out. To that extent the level of credibility plummets sharply.

Since the motion for rehearing was addressed to the court's discretion, it was not required to credit these belated, untimely assertions, or give them the credit they must receive on a motion proper for summary judgment (see *Circle Floor Co.* v. *Totonelly Sons,* 282 App. Div. 179, 182; *Ecco High Frequency Corp.* v. *Amtorg Trading Corp.,* 81 N. Y. S. 2d 897, affd. 274 App. Div. 982, mot. for lv. to app. den. 274 App. Div. 1056).

As to the other issues, it now appeared on the motion for rehearing that plaintiff Overseas in the consolidated action, first captioned above, had examined Hirsch of Tracon before trial, and the result was not productive of evidence to support the defenses, especially in any possible relation to plaintiff holder in the second of the consolidated actions, except only to show that Tracon and plaintiff holder had had a running account between them over a period of time, a fact previously asserted by plaintiff.

Consequently, it cannot be said that Special Term exercised erroneously or abused its discretion in denying the motion for a rehearing.

Accordingly, the order granting summary judgment to plaintiff and the order denying defendants' motion for a rehearing should be affirmed, with costs to plaintiff-respondent against defendants-appellants.

EAGER, J. (dissenting). I would reverse the orders appealed from and deny plaintiff's motion for summary judgment without prejudice to renewal of the motion on completion of disclosure proceedings.

This action is brought to recover the amount of two promissory notes, made by the defendant Cal-Tech Systems, Inc. and indorsed by the defendant Ezrine, each in the amount of $25,000, each dated May 31, 1962 and bearing interest at 6%, with one payable on October 30 and the other on November 30, 1962.

The notes were the last two of a series of notes, numbered 1 to 6, made payable to the order of one Robert A. Martin, and indorsed and negotiated by him to the Tracon Corporation. Approximately three months after date of the issuance of the notes, namely, on August 29, 1962, Tracon negotiated and delivered these two notes, numbers 5 and 6, to the plaintiff.

The plaintiff, a Switzerland corporation, claims to be the holder in due course of these two notes. The defendants, the maker and an indorser of the notes, by their answers and affidavits in opposition to the motion for summary judgment, set forth facts tending to establish prima facie that the notes were fraudulently diverted and proceeds fraudulently used by Martin and that Tracon participated in or took with knowledge of the fraud. Thus, inasmuch as plaintiff claims to hold the notes by reason of negotiation from prior holders who had defective titles, the burden rested upon it to prove that it " acquired the title as a holder in due course " (Negotiable Instruments Law, § 98). The plaintiff was bound to come forward and show affirmatively that it acquired the notes without notice of their questionable validity.

The applicable rule was laid down by the Court of Appeals in *Canajoharie Nat. Bank* v. *Diefendorf* (123 N. Y. 191, 202), as follows: " The fact that they took the paper before maturity, and paid the full value thereof, in the absence of other facts, undoubtedly affords a presumption of the good faith of the transaction. But where it further appears that such property has been fraudulently or illegally obtained from its owner or maker, and under such circumstances that the person putting it in circulation could not maintain an action thereon, it is incumbent upon the holder in order to succeed to go farther and show the circumstances under which it came into his possession, and that he has acted in good faith in the transaction."

See, also, *New York Bankers, Inc.* v. *Duncan* (257 N. Y. 160, 165); *American Exchange Nat. Bank* v. *New York Belting*

*& Packing Co.* (148 N. Y. 698, 703); *Greenblatt* v. *Miller* (255 App. Div. 18, 20).

So, under the circumstances here, the plaintiff, moving for summary judgment, was bound to make a frank and full disclosure of the details surrounding its acquisition of the notes. All of the facts and circumstances with reference to the negotiation of the notes were relevant; and thereupon the question would be, what do they collectively show. (See *State Bank of Binghamton* v. *Bache,* 162 Misc. 128.) With the facts and circumstances before it, then it would be for the court to say whether or not there existed a bona fide issue as to the validity of plaintiff's alleged status as a holder in due course.

Certainly, if the court is to be expected to conscientiously pass upon the question which will be decisive in this case, it is entitled to have a full presentation of all relevant details bearing upon plaintiff's alleged duty of inquiry and good faith. Notwithstanding its burden, the plaintiff, either inadvertently or deliberately, has failed to come forward with a full and proper showing of the circumstances surrounding its purchase of the notes. For instance, the following matters are unexplained:

*First.* The plaintiff, in its moving affidavit, merely averred that, during a period of two and one-half years prior to its taking of the notes, it had done $350,000 worth of business with Tracon and its president, Hirsch, but we are not told the nature of the business nor how the accounts between the parties stood at the time the plaintiff acquired the notes.

*Second.* It appears from the testimony of Hirsch, given on an examination before trial in a consolidated action, that Tracon and Hirsch were in a " continuing business relationship with plaintiff "; that they had " borrowed " from plaintiff; that they had moneys " on deposit " with plaintiff; and that, on the date plaintiff discounted the notes, Tracon and Hirsch " had loans outstanding " with plaintiff, with a possible small balance standing with plaintiff. In view of this testimony of Hirsch, there may be real significance in plaintiff's failure to disclose the status of its accounts with Tracon and Hirsch as of the time of the taking of these particular notes. It may be that, by reason of credits due plaintiff or securities held by it, it would be protected if the notes went bad. If this were so, the plaintiff would not be a holder in due course. (See *Citizens' State Bank* v. *Cowles,* 180 N. Y. 346; *Mizell* v. *Hicks,* 8 N. Y. S. 2d 158, 162.)

*Third.* The plaintiff claims it paid $49,100 for these notes of $50,000 face value. The plaintiff claims to establish the fact of its payments in said last-mentioned amount by incompetent evidence, to wit, letters and cables which are hearsay. Why did not plaintiff present a photostatic copy of its books or ledger pages showing the accounts with Tracon and Hirsch?

*Fourth.* Here, at the time of negotiation to plaintiff, the notes were indorsed in blank and held by Tracon. Why did the plaintiff insist on the personal indorsement of Hirsch (the president of Tracon) if plaintiff's accounts with Tracon were in satisfactory condition and if the plaintiff had faith in commercial paper which it took from Tracon?

*Fifth.* The plaintiff, a foreign bank, demanded a flat discount of $900 net on the taking of the notes. By virtue thereof, and if the notes were paid on their maturity in two or three months, as would be expected in the case of good commercial paper, the plaintiff would earn better than a 20% return (annual basis) on its money, that is, with the plaintiff collecting, in addition to the discount, the 6% interest from date of notes to maturity. We can take judicial notice that the discount rate demanded and received here was grossly higher than the prevailing rates in the New York market; and, in this connection, observe that a "discount taken may be so great as to impeach the good faith of the purchaser". (*Second Nat. Bank* v. *Weston,* 172 N. Y. 250, 257. See, also, *Bank of Monongahela Valley* v. *Weston,* 172 N. Y. 259, 267, 268; *Vosburgh* v. *Diefendorf,* 119 N. Y. 357, 365.)

*Sixth.* It appeared on the face of the notes that they were the fifth and sixth numbered notes in a series and that a default in any earlier maturing note would give the holder of these particular notes the option to declare all of them due and in default. Plaintiff does not say one way or another whether it inquired about the status of the earlier maturing notes.

*Seventh.* Sapir, the attorney for Tracon, in his affidavit, says he "personally participated" in the negotiation of the notes to plaintiff. But neither he nor any representative of the plaintiff states what was said or written between Sapir and the plaintiff.

*Eighth.* Plaintiff's vice-president, in his moving affidavit, states that the plaintiff bank "credited Tracon's account with $49,100". Of course, the "mere discounting of a note by a bank and the placing of the amount of the discount to the credit of the holder does not constitute a taking of the note for value."

(See *Franklin Washington Trust Co.* v. *Jaeger,* 282 App. Div. 1067, citing cases. See, also, *Citizens' State Bank* v. *Cowles,* 180 N. Y. 346, *supra.*)  The plaintiff, after crediting Tracon's account with the amount above mentioned, on September 7, says it cabled $45,000 to the Netherlands Trading Society to be placed to Tracon's credit; that on September 13, 1962, it transmitted $3,000 to the Chemical Bank New York Trust Company to Tracon's credit; and that on November 2, 1962, it transferred a balance of $1,096.90 to plaintiff's credit with the Netherlands Trading Society.  Thus, the plaintiff, in its moving affidavits, was bound at the very least to positively deny any notice of infirmities as of the time of the advances (cf. *Seymour* v. *McKinstry,* 106 N. Y. 230, 240), but the plaintiff does not even say whether or not, pending its receipt of the notes and the remission of the funds, it had, in fact, made any investigation or acquired any information with respect to the validity of these notes.  Particularly, it is to be noted that the advance of $1,096.90 was made two days after the maturity of one of the two notes, the said note then being in default. Certainly, as to this amount, the plaintiff is not a holder for value before maturity.  (See *Citizens' State Bank* v. *Cowles, supra.*)

When all the circumstances surrounding plaintiff's acquisition of the two notes are revealed, it may very well be that they were such as to " create suspicion concerning [its] good faith and [its] lack of notice or knowledge of the infirmity in the title of the person from whom [it] is alleged to have purchased.  The inferences and the probabilities, as well as the credibility of the witnesses [would then be] matters for the consideration of a jury in determining the questions of fact." (*Neinken* v. *Brill,* 251 App. Div. 730, citing cases).

A motion for summary judgment may not be utilized as a means for shifting the burden of proof.  (See *Lonsky* v. *Bank of United States,* 220 App. Div. 194.)  So, neither the plaintiff nor the majority is on firm ground in taking a position that plaintiff should succeed on this motion because the defendants have merely established suspicious circumstances in the discounting of the notes with the plaintiff.  Where, as here, suspicion is in the case because of the failure of the plaintiff to come forward and disclose much relevant detail exclusively within the knowledge of its employees and others standing in hostility to the defendants' rights, then, the plaintiff has not sustained the burden placed upon it by section 98 of the Negotiable Instruments Law and the case law.  The fact is that,

on the record here, the plaintiff's evidence "is not so barren of suspicious features as to command the conclusion that it has proved itself to be a holder in good faith." (See *New York Bankers, Inc.* v. *Duncan,* 257 N. Y. 160, 166, *supra*). In any event, at this stage of the action where the plaintiff has been less than frank and the defendants have not had the opportunity of examination and cross-examination of plaintiff's witnesses, the awarding of an accelerated judgment to plaintiff is contrary to precedent and the interests of justice. (See, further, *Karpas* v. *Bandler,* 218 App. Div. 418.)

The defendants' right to defend upon the merits is not to be defeated upon the ground of laches, nor on the theory that the court as a matter of discretion had the right to deny the motion to renew and reargue. Concededly, the plaintiff's motion for summary judgment, when originally made, was brought on without giving the defendants reasonable opportunity for disclosure proceedings. On the papers before the court, plaintiff's motion then made was not properly supported and should have been denied; and we have an appeal here from the order thereon. The fact that the corporate defendant (the maker of the note) sometime later moved to renew and reargue the matters at Special Term, without proceeding for an examination before trial, is immaterial. It had no right to proceed for an examination before trial when summary judgment had been granted against it; and, in any event, on the motion for renewal and reargument, the summary judgment should have been vacated.

Botein, P. J., and McNally, J., concur with Breitel, J.; Eager, J., dissents and votes to reverse in opinion, in which Rabin, J., concurs.

Orders and judgment affirmed, with costs to the respondent.